So, our next case is 22-1965, Trenton Threatened Skies v. the FAA. Mr. is it Tabor? Yes, Your Honor. May it please the Court and Your Honors, my name is Stephen Tabor, representing the petitioners, some of whom are here today. I'd like to reserve three minutes for rebuttal. Sure. Since the late 1990s, FAA and Mercer County have presented misleading arguments to buttress the false narrative that Trenton Mercer Airport is not expanding, and therefore the surrounding communities will experience no significant environmental impact. Let me stop you right there, sir, because there is considerable discussion, I know, in the briefs throughout this case of events and actions taken over a long period of time, but I assume you would agree with me that the only thing that we are here for this Court to review is the Fonzie Rod of most recent origin that came about as a consequence of the 2018 period of time when this project was proposed, right? Yes. And that's the only thing that you may timely attack here. That's correct, Your Honor. And as such, I also assume you would agree that you do have a considerable hurdle there. Our own case law acknowledges that as long as we can determine that the agency took a hard look, and that's a pretty common language of environmental consequences, we cannot substitute our own judgment for that of the agency. Now, I've read the Fonzie in its entirety. It's not like reading a Le Carre novel. I will grant you that. I've read it in its entirety, and I've considered the relevant portions of the record. How did the FAA fail here to take a hard look? Well, first of all, the most important part is the fact that the FAA used false premises in its assessment of the environmental impacts. Well, that's general, but specifically, what were those false premises? The false premises were the fact that this was the same size terminal. It would have four gates. The current one has four gates, and the proposed has four gates. Well, let's get to that. What struck me when I first took a dive into this case is that it's unlike the several, and I am the opposite of an expert on these, but the cases I'm familiar with and read about have usually involved the building of another runway or the extension of a runway, and that's not the case here, correct? I mean, we are talking solely about the construction of a new terminal that was originally built in 1975, right? That's correct. This environmental assessment, this FONSI and the ROD concern the terminal. However, there are other projects that need to be examined when you're talking about segmentation and when you're talking about cumulative impacts. What specific projects? There was no expansion to the runways, correct? There's no expansion to the runways. There were parallel taxiways that were developed. There was an extension of the runway protection zone. And those are safety steps, safety measures, right? Well, the FAA certainly calls them safety measures, but they were safety measures because of the addition of frontier airlines. And that involved aircraft traffic, and aircraft will occasionally collide when they are off a runway. It seemed to me that they would have enormous, profound safety implications. Well, the development of the taxiways were in part because frontier airlines was coming into the airport. But frontier's already in the airport. Well, yeah, in 2012. But we're here to talk about 2018 forward, right? Well, if you're talking about cumulative impacts and segmentations, you need to talk about prior actions as well as the current actions. Yeah, I've been trying to wrap my head around that, and I hope you can help me. Because I'm left with, when we talk about cumulative impacts and we talk about segmentation, it has seemed to me that what the process requires is that the agency be examining those factors that are somehow going to be introduced or added as a consequence of this new project to what has already occurred. That's what you're saying we have to look at, what has already occurred. But isn't what has already occurred just a baseline from which this new project and whatever emanates from this new project has added to that baseline? Well, addressing that issue, Your Honor, the FAA omitted a step in its cumulative impacts assessment. Did you say omitted? Omitted a step. The baseline, excuse me, the FAA assesses change, or excuse me, assesses the cumulative impacts based on change in, for example, the amount of noise. If there's a 1.5 decibel change in the noise created by the project, then that's a significant impact. The construction of the project or the results after the project is completed. We are talking about two tracks here. You have one condition, and you have to have the project. What is that change in the project? I didn't make, I'm sorry, I don't think I made myself clear. If I understand what the EA has done here is to assess the environmental impact of the actual construction or conduct of the project itself, and what results in terms of environmental impact during the course of that construction, and then what has occurred afterward. Okay, but that's not cumulative impacts. Cumulative impacts looks at other actions, both prior, current. Again, I haven't made myself clear. Am I right that I'm honestly trying to understand that is the process one of assessing any significant environmental impacts that result from the course of construction itself, and also whatever significant environmental impacts occur after the project has been completed? Well, yes and no. I mean, certainly that's the one step that has to be taken. The other step is that you have to compare what, because the FAA assesses significant change or significant impact on the basis of a change between what existed before and what the project will create, you have to look at each prior action and determine how much change there was for each prior action. When you say prior action, I'm lost though, because as Judge Smith was asking you, we're talking about the construction of a terminal. Okay. What prior actions are you talking about? Well, prior actions are, for example, the introduction of Frontier Airlines to the airport. That was in 2012. Yes, but it's a prior action. It's a prior action. Is that something we could consider when we're taking a look at the construction of a new terminal? Yes, under the cumulative impacts analysis. But not that it was cumulative in 2012. The cumulative aspect is what has occurred, what is going to occur as a result of this project added to what happened in 2012, right? Well, yes, and all the other projects as well. But what I'm saying is, for example. What other projects are you asking us to consider? Well, the introduction of Frontier Airlines to the parallel taxiways, the addition of the enlargement of the runway protection zone. Those are the ones that come to mind. And each one of those projects has a, you know. For example, one of them might have created a 0.5 increase in decibels. Another one, 0.2 increase in decibels. You add all those up. You add all those up. And then you add on what this project would create. And maybe it goes over 1.5. We don't know because FAA admitted that step. Let me ask you a question that, to me, seems to go to the heart of what I think is your position. And that is that this project, and by this project I mean the terminal, will induce growth. That is, in a causative way, will induce growth. And induce, I believe, is your word. Am I right? Well, the induced growth. Is or it isn't. Your word. I didn't want to put words in your mouth. The induced growth is part of the false premises argument. Well, all right. I'm glad you said that. Because there is a projection presented by the FAA that growth, passenger use growth, will increase prospectively, irrespective of whether or not there is a new terminal. Right? That's what the FAA says. Yes. Are you saying that's building a false premise? I'm saying that the introduction of an enlarged, for example, an enlarged terminal apron, which is a capacity enhancing portion of this project, will cause even more growth than what we have here. Sir, you have used the term false premise, and I'm trying to understand what you mean by that. Is it false? Yes. They claim that the number of gates or parking positions is the same as the one that is currently used. In fact, there has been substantial increase in passenger use over the period of time during which this antiquated 1975 terminal has been in existence. Right? Run that by again. Passenger usage at the Trenton Airport has increased dramatically over a period of time, in spite of the fact that there is an antiquated terminal of 1975 vintage there. Doesn't that support an inference that the improvement of or replacement of this terminal would not necessarily by itself induce passenger? No, because the terminal is much larger than what would be necessary for it. Wouldn't that be a reasonable inference to draw? I would say no. Would that be a reasonable inference to draw based upon this historical experience, which they've demonstrated in the EA and the FONSI, has taken place? No, that's not a correct inference, in part because way back when they had a two-gate terminal and were creating a 64,000 square foot terminal instead of a 125,000 square foot terminal that they're now after. And that would have been sufficient for the growth that the FAA says will only happen here. I'd like to go back to something that Judge Smith asked you about at the beginning of this. Most of your arguments seem to rest on the premise that the new terminal will increase air traffic. And we've been discussing all of that. But the FAA, it seems to me, is entitled to the finding that they made that only airport projects that increase air traffic are those dealing with the runway additions and extensions of the runway. And it seems that most other courts of appeals, when faced with this, have agreed with the FAA interpretation. That is an incorrect reading of the FAA's reasoning in the sense that, for example, the increase in a terminal apron, which is part of this project, that is also considered by the FAA to be a capacity-inducing or enhancing project. And that's in FAA Order 5090.5, page 4-16. And there's a whole list of different kinds of projects other than runway extensions that the FAA considers to be capacity-enhancing. And it's simply the fact that none of those other cases have dealt with any of those other capacity-enhancing projects. And that a court hasn't ruled on that. It's incorrect to state that the FAA has stated that only runway expansion will be enhanced capacity at the airport. Doesn't the FAA have expertise in forecasting air transportation demand? They certainly do forecast. I mean, that's the current state of the law that they have. Isn't the current state of the law that we owe them some deference when it comes to forecasting air traffic or air transportation demand? Certainly, you all owe them. Yes, that is correct. Thank you. We'll see you in a moment.  Good morning. Good morning. May it please the Court, Rebecca Jaffe appearing on behalf of the FAA. I'd like to start with three points. First of all, the new terminal will not induce growth. Second, FAA properly analyzed cumulative impacts. And third, FAA did not segment its review of this project from any other projects. What do you base your first contention on, that expanding or building a new terminal will not induce growth? And how do you define growth, really? The new terminal will not induce growth in air traffic operations, and I base that on FAA's analysis of its forecasts of growth. And the airport also forecasted growth. Both forecasts, the airports and FAA's, showed that growth would increase whether or not a new terminal is built. It has already been increasing. Yes, I was just about to ask. There was a question I asked your adversary. Isn't it also based on historical experience that even with this 1975 vintage terminal, there has been a dramatic increase in air passenger travel from there over the years? Yes, yes, that is absolutely true. Air traffic operations and passenger employments both have been increasing dramatically. And to your question about what the FAA considers when it makes its forecast, it considers historical data. It also considers economic data. It considers tourism trends. There's a lot of people that seem interested in going from Trenton to Florida. It considers all sorts of factors. It is entitled to deference in its forecasting. And it approved the airport's forecasts of growth in air traffic operations and passenger employments. It approved that as consistent with its forecasts. And the AR site for that, we have a letter at JA3, tab 14, 6522. This court, the Third Circuit, has specifically held that FAA is entitled to deference in its forecasts of demand. And that's in Tinicum Township versus U.S. Department of Transportation, 685F3D288 at 294. To opposing counsel's point specifically that this project increases the size of the terminal apron, and that will increase the capacity, that's not the case here. The terminal apron is currently cluttered. There's a site for that at JA1, tab 4, page 81. And when the new terminal is built, three of the existing parking spaces will no longer be used as aircraft parking spaces. And they will instead be used to store ground service equipment and maintenance equipment for that ground service equipment. There can be situations where increasing the size of parking spaces could potentially increase capacity. For example, if your parking spaces are too small to hold larger aircraft and you can't get – the operations aren't coming because you don't have the large aircraft that the market wants to bear or whatever, if you increase parking spaces in that sense, that's what the FAA order that opposing counsel referenced is talking about. You can potentially increase capacity in that sense, but that's not what's happening here. The current parking spaces are for narrow-bodied aircraft. There's like one aisle down the middle. The new parking spaces will also be for narrow-bodied aircraft. Is there any issue regarding the capacity of some of the parking spaces to accommodate the A320s that are currently servicing the airport? I seem to recall seeing a concern that not all of the parking spaces had been reinforced to a degree that they would provide sufficient support for the A320. Yes, Your Honor. So first of all, I think that Petitioner's argument in that respect is based on their own Google Earth images, and that's extra record evidence that the Court should disregard. But moving past this – Not in the original administrative record? Those Google Earth images, no, Your Honor. But moving past that, two of the parking spaces at the airport were the most frequently used parking spaces. They were strengthened to comply with – FAA has circulars governing the strength of pavement at airports, and they were the most frequently used, and they were showing some wear, so they had to be strengthened to comply with FAA pavement standards. But all four existing parking spaces are used and have simultaneously accommodated aircraft at all four spots, and a site for that is at GA2 tab 7279. Something that you haven't mentioned, but it seems to me that while it doesn't affect or doesn't impact any of the findings or determinations made by the FAA, it does certainly explain the origin of this project, and that is, am I correct that the existing terminal is not ADA compliant? The existing terminal does not meet modern ADA standards. It has been – What about TSA requirements? It does not meet modern TSA standards as well. What does it mean to get a grade F by the ACRP? And I never knew that such a thing as the ACRP existed until I got into this case. But what does that mean? Your Honor, I'm first going to confess, I had never heard of the ACRP either, so we're on the same page there. That's the Airport Cooperative Research Program, and they – but it doesn't seem to be – at least that's what the FAA website says, but it's not really a part of the FAA. Is that right? Yes, Your Honor. And the Airport Cooperative Research Program prepares guides for airports about how to design terminals, how big they need to be, how many bathrooms do you need, how much space do you need. And so the plan for the new terminal is based on guides from the Airport Cooperative Research Program, the Transportation Security Administration. The current terminal does not meet modern standards for the ADA, for TSA. The TSA lanes in the terminal, there's two, and they are quite cramped in there. It also doesn't meet modern fire egress standards. It's grandfathered in on a lot of those requirements. If the court wanted a site to the amount of square footage that there should be under the Airport Cooperative Research Program guides, I would direct the court to Joint Appendix 1, tab 3, AR 70. Did the FAA do an adequate environmental justice study? Yes, Your Honor. Absolutely. Was it expansive enough? Yes, Your Honor. First, I want to note that petitioner's argument that the FAA should have examined impacts 10 miles outside of the terminal is based on extra record evidence, and so the court can reject the argument on that basis alone. Moving past that, the FAA – But the FAA decided that it didn't even have to do an assessment as to health risk. Is that right? It did not do a health risk assessment. That is true, Your Honor, because it – Is there anything unusual about such a determination? I mean, it's one thing to have undertaken the environmental justice issue and debate the adequacy of it, but here there was no assessment at all. Am I right? There absolutely was an environmental justice analysis that the FAA did. It looked at census tract data and – Please tell me the difference between a census block and a census tract. I'm baffled. Census blocks are basically smaller subsets within census tracts, and I – What difference would that have made here had the one been chosen instead of the other? I – Maybe your adversary can answer that, too. It would not have made a difference. In fact, we – FAA corrected me when preparing for oral argument. FAA looked both at census tracts and at census blocks, and the site for that is at AR 176. That's Joint Appendix 2, Tab 5. After the 2020 census results came out, first the census results come out in tract form, so in bigger blocks of data, and then later on census block data came out, and FAA updated its analysis and it explained that on AR 176. In any event, Your Honor, to precisely answer your question, I think there are cases where looking at census blocks might – the larger lens of a census tract could theoretically dilute the presence of an environmental justice community that's in one smaller portion of a census tract, but that didn't happen here because there are no environmental justice communities in the immediate vicinity of the airport, and FAA looked both at census tracts and later validated its analysis by looking at census blocks, and it used the EPA's environmental justice screening tool. Could you explain the concept of independent utility and how it impacts on your position? Absolutely, Your Honor. So FAA did not segment its review of this project from any other projects. Segmentation occurs when a proposed action is broken into component parts to reduce impacts, and the test to determine whether segmentation has occurred is the independent utility test, and basically the question is, are the actions connected such that one would not happen without the other happening, or do the different actions have independent utility such that each project would take place regardless of the other? So the new terminal has independent utility because the current terminal provides poor service and fails to meet modern ADA, TSA, fire egress standards, and also modern customer expectations of convenience and comfort. Petitioners reference taxiway improvements. Those at the airport, those, one, were not to increase capacity at the airport, but two, they had independent utility. First of all, airports are often continually engaging in various maintenance projects to maintain the pavement, et cetera, but the taxiway projects specifically were about maintaining adequate separation between taxiways and runways. The airport moved one of the taxiways over to get it out of the runway safety zone, basically. They also, there were some nonstandard, FAA calls it nonstandard geometry, basically there were some awkward turns, and that can cause pilot confusion, so they straightened out those turns. Those all have independent utility regardless of whether or not a new terminal is built, and the site for some concise explanation of the taxiway improvements is at AR-280. Petitioners argue that taxiways can increase capacity, but there are certain types of taxiways that can. Those are called high-speed exit taxiways. They have them at LaGuardia and JFK, and basically it means that a plane can land and it doesn't have to slow down all the way before it leaves the runway. It can land, only slow down a little bit, get on a high-speed exit taxiway, another plane can land 30 seconds later. That is not the type of taxiway improvements that have been happening at this airport. I see that my time is up.  Thank you. Thank you. Good morning. Good morning, Your Honors. May it please the Court, Eric Philst for Intervenor, Mercer County. Mercer County needs to build a new terminal to accommodate current and projected growth at an acceptable level of service and to comply with current TSA, ADA, and design standards. That means a physically larger terminal, but the critical point for this case, as your questions have indicated, is that all forecast growth will occur whether or not the new terminal is built. So the new terminal will not cause the noise and emissions petitioners fear. The only result of building a new terminal will be a better and more efficient customer experience in the new terminal. Conversely, not building it will simply mean a continually worsening, congested, and unpleasant terminal experience. What's generating all this growth in Mercer County? I think it's been primarily, I mean, it's just generally a demand for air service, the introduction of frontiers operations, which have increased dramatically without the new terminal, with the existing airfield, with only the safety improvements we've talked about. So that's what's driving, and the forecast that was done here is what's called an unconstrained forecast. It looked out at air service factors, economic and demographic factors, and said this is the amount of growth that we expect to get. And as the record shows, the modeling, the forecasting the county did was robust, looked at air service factors, looked at demographic factors, considered an immediate jump in employments after the new terminal is built, sort of something exciting, and projected that forward. Two things are important about that. One, all of that growth can be accommodated in the existing terminal. It just will be a really bad experience. It will be inefficient, and when things go bad, whether because of mechanical or weather delays or other problems, it will get really, really bad. But all growth can be accommodated in the existing terminal. The new terminal won't induce any new growth. And I think this is really the critical point. As you pointed out, the courts that have considered this issue, the FAA and its expertise, all agree that a new terminal alone, even a larger terminal, a much larger terminal, as the Ninth Circuit found in the City of Los Angeles Burbank case, will not induce further growth. Petitioners don't show any mechanism why there will be even more growth than the unconstrained forecast shows, which could be accommodated in the existing terminal. Nor do they offer any reason why the FAA's judgment should be called into question, certainly nothing that would suggest that it is arbitrary and capricious or not based on substantial evidence in the record, including the record of what's happened at this airport itself, where growth has exceeded initial expectations in the existing terminal. And everything has, with a degree of unpleasantness and inefficiency, that growth has been accommodated. The new terminal simply will not cause any environmental impacts that have not been disclosed. And the delta, the change between keeping the existing new terminal and building a new terminal, will not result in any significant environmental impacts. I see my time is up. Thank you for your time and attention. I would ask that you affirm. Mr. Taylor, what is it you're asking us to do? Are you asking us to maintain the status quo? No, Your Honor, what we're asking you to do is to vacate and remand the FONSI rod and recommend that an environmental impact study instead of an environmental assessment be done. We're not asking that they not build a terminal that doesn't comply. To keep the existing terminal that doesn't comply with ADA or TSA, what we're asking is a terminal that is properly sized for the growth for the operations that are currently at the airport. You're disputing that the current terminal is inadequate. The current terminal is inadequate for TSA and ADA reasons. And the level of service, obviously, we don't dispute that the level of service is low. But what we do dispute is that the need for this size of terminal will generate and it is a capacity-enhancing project because they'll have four gates and they'll have a terminal apron that will accommodate additional aircraft and provide a place for it. They're increasing the terminal apron by 43 percent. It still comes back to this, the change will induce some growth. Correct. That's certainly a part of the argument. Isn't that your major argument? Without that argument, what do you have? Yes. Well, there are the cumulative impacts and segmentation arguments as well. But the major argument is that the FAA and Mercer County believe that they are not increasing the capacity of the terminal, that they have four gates now and they're creating four gates in the future. Not additional gates, but four gates now, four gates then. Correct. And that just defies logic and common sense because they're having four gates that are serviced by jet bridges. They have jet bridges? No, in the project. Oh, all right. Right now they use portable stairs. Right, exactly. And the places where those planes park now, that's not being demolished. They'll still be there. They'll still be available for emergencies. They're increasing the size of the terminal apron, which the FAA itself, in its order, 5090.5, says that that's a capacity-enhancing project. I see my time is up. Thank you. Mr. Tabor, I hope my colleagues will indulge me, but I feel strongly about this and so I want to raise it with you. And it's a concern that arises from perhaps the tenor of the times to a great extent, but it involves some language that was used in the briefing on your side of the case that disturbed me, and I'm simply going to indicate what I saw. The reply brief indicates that the FAA conspired to make false claims, lied about expanding the airport, repeatedly mischaracterized the scope and impact of the project, that the FAA lacks professional and scientific integrity, and that instead of being honest with petitioners, FAA and Mercer County have chosen to view the petitioners as opponents to be lied to and deceived. That, to me, is not the kind of language that we're accustomed to reading in the briefs presented to us or that we see as appropriate for argument in a court of law. I don't mean to speak for my colleagues. Again, I'm speaking only for myself, but I raise this because I think that this language was more than over the top. That's all I have to say. Thank you, Your Honors. Thank you, Counsel. We'll take this matter under review.